**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**FRANCES A. CLIFFORD,**

        **Plaintiff,**

**-vs-**                                                  **Case No. 6:04-cv-543-Orl-KRS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

_____

## ORDER

This matter came before the Court for consideration without oral argument on the complaint filed by Frances A. Clifford seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for social security disability benefits. Doc. No. 1. The Commissioner answered the complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA"). Doc. No. 8. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Middle District of Florida Local Rule 6.05 for adjudication. Doc. No. 10.

**I.    PROCEDURAL BACKGROUND.**

On June 29, 2001, Clifford applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401 *et seq.* alleging a disability onset date of October 15, 1997. TR. 99-101. The SSA denied Clifford's application

both initially and on reconsideration. TR. 86-87, 90-91. Then, Clifford made a timely request for a hearing. TR. 92-93.

An Administrative Law Judge ("ALJ") held a hearing on September 16, 2003. TR. 566. Clifford, who was accompanied by her attorney, testified at the hearing. TR. 566-97.

The ALJ found that Clifford had not engaged in substantial gainful activity since October 15, 1997, the alleged onset date of her disability. TR. 15.

The ALJ concluded that the medical evidence showed Clifford has chronic ear infections with hearing loss, headaches, chronic pulmonary insufficiency, a history of lupus and was "status post osteomyelitis of the mastoids[.]"[1] TR. 19. He concluded that these impairments were severe, but that they did not meet or equal any impairment listed in the SSA regulations. TR. 19. The ALJ also acknowledged that Clifford had depression and arthritis of the back, but that these impairments did not significantly limit her ability to work. Therefore, he found that these two impairments were not severe. TR. 19.

The ALJ concluded that Clifford had the residual functional capacity ("RFC")[2] to do the following: (1) lift and carry up to ten pounds; (2) sit for up to six hours in an eight-hour workday;

---

[1] Osteomyelitis is an infection of the bones. The Cleveland Clinic Health Information Center, at http://www.clevelandclinic.org/health/health-info/docs/2700/2702.asp?index=9495 (last visited Sept. 12, 2005). The mastoid is a bone in the skull located below the ear canal. Am. Academy of Otolaryngology, *How the Ear Works*, at http://www.entnet.org/healthinfo/ears/ear.cfm (last visited Sept. 12, 2005).

[2] Residual functional capacity ("RFC") "is what an individual can still do despite his or her limitations." Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34474-01 (1996). It takes into account "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id*. RFC assesses the individual's ability "to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id*. RFC does not represent "the least an individual can do despite his or her limitations or restrictions, but the most." *Id*.

and (3) stand or walk for up to six hours in an eight-hour workday. "Her depression may result in some mild difficulties in maintaining concentration and attention, but does not result in any other mental limitations." TR. 21. In reaching this conclusion, the ALJ found that Clifford's testimony regarding the extent of the functional limitations arising from her impairments was not entirely credible. TR. 19. In reaching this conclusion, the ALJ relied upon Clifford's inconsistent reports to doctors about the number of headaches she suffered, failure of the objective medical findings to support her claims of dizziness at least twice a week, and her ability to engage in activities of daily living. TR. 19-20.

The ALJ found that Clifford's RFC would allow her to return to her past relevant work as a teacher's assistant, and cashier and retail manager of a stationary department. TR. 22. Therefore, the ALJ concluded that Clifford was not disabled. TR. 21.

Clifford requested review of the ALJ's decision. TR. 8. On February 23, 2004, the Appeals Council found no basis for changing the ALJ's decision. TR. 5-7. Clifford timely sought review of this decision by the United States District Court. Doc. No. 1.

## II.    JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Clifford's application for disability benefits under OASDI. Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g).

**III.    STATEMENT OF FACTS.**

   A.    *Clifford's Testimony.*

Clifford was born on April 18, 1952.  TR. 571.  She completed high school, during which time she completed a vocational program in ornamental horticulture.  TR. 572.  She was married from 1970 until 1996, when her husband died of lung cancer.  TR. 572.

The last job she held was as a sales manager in the stationary department of a K-mart store in 2000 and 2001  TR. 573-74.[3]  She carried boxes from the supply room. TR. 575.  In one written report, Clifford estimated that she lifted between twenty-five and fifty pounds, TR. 75, but in another written report she estimated that she lifted no more than ten pounds.  TR. 131.  She also stocked shelves and operated a cash register.  TR. 576.  She was "on her feet" nearly all of the time.  TR. 75, 131, 575.  The job required her climb a ladder.  TR. 75.

   Previously, Clifford worked as a teacher's assistant from 1985 to 1996 or 1997.  TR. 573-74.  She testified that this job required her to be on her feet during most of her work.  TR. 575.  This testimony is consistent with a written report Clifford submitted to the SSA in January 2000, in which she wrote that in her job as a teacher's aide she stood and walked five and one-half hours ("almost all day"), sat one hour ("very little") and did very little climbing.  TR. 74; *see also* TR. 130.  However, in written reports submitted to the SSA in February 2000, and June 2001, Clifford wrote that her job as a teacher's aide required her to walk or stand two to four hours, to sit one to two hours, and to climb for either not at all or for no more than thirty minutes.  TR. 65, 107.

---

[3] Based upon the reports of earnings in 2000 and 2001, the ALJ determined that this was an unsuccessful work attempt that did not constitute substantial gainful activity.  TR. 15.

-4-

Clifford testified that she did not lift heavy objects when she worked as a teacher's aide. TR. 575. However, in January 2000, Clifford wrote that she frequently lifted children, each of whom weighed between thirty-five and forty pounds. TR. 74. This written report is consistent with the February 2000 written report, in which Clifford wrote that she occasionally lifted up to fifty pounds. TR. 65. Yet, in the June 2001 report, Clifford wrote that she did not lift more than twenty pounds. TR. 107.

Clifford complained of headaches and trouble hearing due to frequent infections. She had two or three headaches a week, for which she took Darvocet or Lortab. TR. 585-86.[4] The medicine only relieved the headache if she took it in time, however. TR. 588-89. The best form of relief was to lie down with a cold rag on her head. TR. 588. She became dizzy and lost her equilibrium two or three times a week. TR. 587-88. Lifting caused pain in her ears and exacerbated her headaches. TR. 588.

Clifford also had difficulty walking due to arthritis in her back. She took Darvocet for joint pain. TR. 590. In addition, she took Plaquenil for lupus. TR. 590. She had had joint pain since she was diagnosed with lupus when she was twenty years old. TR. 591. Prednisone helped with the pain, but she could not take it for long periods. TR. 591.

Clifford also testified that she had irritable bowel syndrome, which caused abdominal pain. When she had an attack, she had to go to the ladies' room immediately. She had also had this condition since being diagnosed with lupus. TR. 592.

---

[4] In a written report prepared in April 2000, Clifford wrote that Zomig worked to alleviate her migraines. TR. 57.

She also took medication for depression. TR. 592-93. The depression made her anxious and a little withdrawn. TR. 593.

Clifford had trouble walking, standing, and sitting in one place for extended periods of time. TR. 593. She could walk about one block before experiencing back pain. TR. 593. She could stand for about twenty minutes at a time, and she could sit for about the same amount of time. TR. 593-94. She could not lift her granddaughter, who weighed approximately twenty-five or thirty pounds. TR. 594. She could lift a gallon of milk, but she could not lift a ten-pound sack of potatoes beyond "throw[ing] it in the car." TR. 594. She also had trouble climbing steps and ladders–on steps she ran out of breath, and on ladders she "g[ot] out of balance." TR. 595. Clifford stated that she could bend over and touch her toes or knees "maybe once." TR. 595. She was generally able to grip and hold things, though she did not have a strong grip. TR. 594. She had no trouble buttoning buttons or zipping zippers. TR. 594. She had no trouble taking a dish or a glass out of an overhead kitchen cabinet as long as it was not too high. TR. 594. She could pick up an object from the floor, provided it was not too heavy. TR. 595.

An acquaintance who lived with Clifford prepared her meals. TR. 579. Regarding household chores, Clifford helped clean the kitchen after eating, helped stack and unstack the dishwasher, did laundry, made the bed, and did some vacuuming (though it would take her a long time). TR. 579-80. Clifford drove very little, only a few miles "back and forth" to her doctor's office. TR. 580.

On a typical day, Clifford watched "a little" television. TR. 581. She also belonged to the Moose Club, where she went once per week. TR. 582. Her hobbies included completing books of

"find-a-word" puzzles and going to the beach, though she seldom went there. TR. 583-84. Sometimes she socialized with neighbors, but this only entailed some talking "in front of the house" and nothing else. TR. 585.

It usually took her sixty to ninety minutes to fall asleep, and she awakened two or three times every night. TR. 583. She usually awoke for the day between 7:00 and 8:00 a.m. TR. 583. She napped infrequently. TR. 583. She was frequently tired and fatigued. TR. 56-58, 106. She reported no side effects from her medication. TR. 57.

B.      *Medical Evidence.*[5]

Between November 3, 1995 and May 20, 1999, Clifford visited Bernard S. Barbell, M.D., on a number of occasions, the records of which are largely not legible. At these visits, Clifford complained of headaches and nausea, along with various sinus and ear problems such as pain and congestion. *See, e.g.,* TR. 164, 167, 174,  On May 20, 1999, Neil Kramer, M.D., conducted a CT scan of Clifford's paranasal sinuses at the request of Dr. Barbell. TR. 163. Dr. Kramer noted that the scan revealed postoperative changes in Clifford's sinuses and sinusitis.[6] TR. 163.

From December 1996 through November 2000, Clifford also sought treatment at a VA clinic. TR. 184-228. The records reflect consistent complaints of problems with Clifford's ears. They also have several references to lupus erythrematosis. TR. 211, 214, 225.

---

[5] I will not review the evidence regarding Clifford's mental impairments because she does not contend that the ALJ erred in finding that her mental impairments resulted in only mild limitations of function.

[6] Sinusitis is an "[i]nflammation of the lining membrane of any sinus, especially of one of the paranasal sinuses." Stedman's at 1624.

On May 28, 1999, Robert B. Belafsky, M.D., examined Clifford and diagnosed her with otitis media[7] secondary to treatment for an upper respiratory infection. TR. 231. Dr. Belafsky cleaned her ears and aspirated the fluid in them. TR. 231. On June 8, 1999, Clifford returned to Dr. Belofsky's office complaining that her ears had been draining for six weeks. TR. 229. P. Todd Rowan, M.D., an associate of Dr. Belafsky, prescribed Cipro HC otic drops[8] and silicone plugs to keep her ears dry. TR. 230.

On October 4, 1999, a physician whose name is not legible examined Clifford. TR. 218-19. This physician's impressions were that Clifford had chronic otitis media in both ears, and a perforated temporal membrane, among other things. TR. 219.

Clifford's medical records indicate that she received treatment from Santiago W. Calderon, M.D., from December 21, 1999, to March 11, 2002, regarding chronic infection in her ears. TR. 232-338. Between December 1999 and February 2000, Dr. Calderon consistently diagnosed Clifford with otitis, pseudomonas infections, staph aureus, and systemic lupus. TR. 328-38. For these conditions, Dr. Calderon prescribed a variety of medications. TR. 334-35, 337. Treatment notes reflect that increased bowel habits, diarrhea, and nausea were secondary to medication Clifford was taking. TR. 331, 333. The notes also reflect complaints of headaches, but no dizziness. TR. 330. On March 24, 2000, Dr. Calderon released Clifford from treatment with a final diagnosis that Clifford had mastoiditis,[9] sinusitis, and anemia. TR. 325.

---

[7] Otitis media refers to inflammation of the middle part of the ear. Stedman's at 1272.

[8] Cipro HC otic drops are ear drops containing antibiotic and steroidal drugs, which kill infections and limit inflammation. Drugs.com, *at* http://www.drugs.com/mtm/c/cipro_hc.html (last visited Sept. 12, 2005).

[9] An infection of the mastoid bone of the skull, usually a consequence of a middle ear infection. Medline Plus Medical Encyclopedia, at http://www.nlm.nih.gov/medlineplus/ency/article/001034.htm (last visited Sept. 12, 2005).

On January 27, 2000, Clifford underwent CT scans of her paranasal sinuses and her temporal bones. TR. 199-200. The scan of her sinuses revealed evidence of a bilateral medial antrotomy, chronic mucoperiosteal thickening in the right and left maxillary antrum, and findings consistent with acute and/or chronic sinusitis.[10] TR. 200. The scan of her temple revealed chronic otitis media, chronic right mastoiditis, and mild early erosion of the right scutum. TR. 199. On April 10, 2000, Lewis James Edgemon, M.D., examined Clifford. His impressions were chronic right mastoiditis, chronic pansinusitis, rhinopharyngitis sicca, and chemical rhinopharyngitis. TR. 197-98, 189-90.

On February 7, 2000, Clifford underwent an audiological evaluation. TR. 342. This evaluation revealed some mild sensori-neural type hearing loss in her left hear, and a significant moderate to severe hearing loss in her right ear. TR. 342. The audiologist administering the evaluation noted that there was a significant amount of fluid and moisture built up in Clifford's right ear. TR. 342. Clifford's speech discrimination scores were in the excellent range in each ear when live voice speech stimuli were presented to each ear at MCL levels.[11] TR. 342. In June 2000, Clifford complained to an audiologist that she was having intermittent difficulty understanding speech. TR. 195. The audiologist recommended retesting after Clifford's next surgery. TR. 196.

---

[10] Antrotomy is an incision through the wall of an antrum, which refers to any nearly closed cavity, particularly one with bony walls. Stedman's at 109. A mucoperiosteal thickening is an enlargement of the mucus membrane that coats the inside of the nasal sinuses. *Id.* at 1134.

[11] MCL in this context refers to "most comfortable listening level." Carol J. Yetter, *What is a Hearing Aid Evaluation?*, *at* www.wou.edu/education/sped/wrocc/Hearing%20Aid%20Eval%20-%20web%20.pdf (last visited Sept. 12, 2005).

On February 14, 2000, Devang Shah, M.D., performed a right mastoidectomy on Clifford. TR. 370.  Dr. Shah's diagnoses before the operation was chronic mastoiditis and possible cholesteatoma, and his diagnosis after the operation was chronic mastoiditis and middle ear inflammatory tissue.  TR. 370.

Anthony P. Joseph, M.D., treated Clifford from April 2000 to May 2001.  TR. 376-86.  She initially complained of leg pain.  TR. 379.  Joseph treated Clifford with medication.  TR. 376.

In May 2000, Clifford was examined by Malcolm J. Graham, III, Ph.D., at the request of the SSA.  Clifford told Dr. Graham that she helped to care for her boyfriend's grandson, including swimming with him.  She also stated that she might do yard work and other household chores. TR. 397.

On July 20, 2000, Dr. Shah examined Clifford prior to endoscopic sinus surgery.  Dr. Shah's impression was chronic sinusitis.  TR. 357.  On May 1, 2001, Dr. Shah performed a left mastoidectomy on Clifford.  TR. 360-61, 363-64.   Thereafter, Clifford again complained of facial congestion and headaches in September 2001.  Dr. Shah diagnosed the problem as a recurrence of sinusitis with mastoiditis.  TR.  277.

In May 2001, Clifford returned to Dr. Calderon.  TR. 322.  He diagnosed Clifford with left mastoiditis and prescribed medication.  TR. 316-22.  A June 21, 2001, treatment note reflects that Clifford complained of headaches.  TR. 310.  She also had nausea but not dizziness.  TR. 309. She also had difficulty hearing.  TR. 245, 293.  Dr. Calderon continued to make similar diagnoses and prescribe similar treatment as Clifford had periodic appointments with him through March 2002. TR. 232-306.

In 2001, Jeremy Steinbaum, M.D., inserted devices to administer antibiotics to Clifford intraveneously to address her recurrent osteomyelitis. TR. 344-48, 350.

From July 23, 2001, to May 14, 2002, Clifford visited James S. Atkins, Jr., M.D., a neurotologist, on a number of occasions. TR. 410-35. Dr. Atkins noted that her tympanic membranes had perforations with drainage, and that she suffered from migraines. TR. 434. He diagnosed her with chronic otitis media. TR. 435. In August 2001, Dr. Atkins performed a tympanomastoidectomy[12] on Clifford's right ear. TR. 458. He performed the same operation on the left ear in October 2001. TR. 445, 489. In December 2001, Dr. Atkins again performed a left revision mastoidectomy. TR. 486. By February 2002, Clifford reported that her pain was significantly better. TR. 412.

On September 12, 2001, T. Thiruchelvam, M.D., completed an examination of Clifford at the request of the Florida Office of Disability Determinations. TR. 474-77. At the time of this examination, Clifford complained of problems with her hearing and ringing in her ears. She also had daily headaches with nausea and vomiting, sometimes not controlled by medication. She reported irritable bowel syndrome with two or three loose stools per day. She also reported low back pain "on and off." TR. 474-75. Upon examination, Dr. Thiruchelvam noted that Clifford walked slowly, complaining of pain in the back of her thighs and calves. TR. 476. Her strength, reflexes, and sensation were normal. TR. 476. Dr. Thiruchelvam's impression was that Clifford appeared to be in generally good health with no clinical signs of significant respiratory

---

[12] A tympanomastoidectomy is a surgical procedure to remove tissue affected by mastoiditis from in and around the tympanic membrane. *See* Oregon Health & Science University, *Tympanomastoidectomy*, at http://www.ohsu.edu/ent/ear/tymp.html (last visited Sept. 12, 2005).

impairment. He opined that she would have difficulty with a graded exercise treadmill test based on her complaints of joint and muscle pain. TR. 477.

In September 2001, Clifford was examined by Howard L. Kreger, M.D., for complaints of right thigh pain and numbness in her feet. An electromyogram did not reveal evidence of radicular or sciatic nerve involvement, but Dr. Kreger noted a sensory deficit consistent with meralgia parasthetica.[13] TR. 465, 470-71. Dr. Kreger referred Clifford to a neurologist to assess her leg pain. TR. 463.

Dr. Kreger also treated Clifford for complaints of daily headaches. TR. 462-68. Clifford reported that she had pain, nausea and vomiting with sensitivity to light (photophobia) and sound (phonophobia). She took Darvocet on a nearly daily basis. Dr. Kreger cautioned Clifford against using Darvocet because it would create a "rebound headache phenomenon." TR. 468.[14] After an adjustment in her medication, Clifford reported that she was having headaches only once or twice a week, which were relieved by Zomig. TR. 464-65. While she subsequently reported continuing to have headaches, they were much better controlled with medication. Dr. Kreger's notes reflect that Clifford had lightheadedness when she took the wrong dose of medication, TR. 463, and as a result of an antibiotic, TR. 462.

From January 2002, through November 2002, Clifford was treated by M. Webster, M.D. She consistently complained of sinusitis and related problems. *See, e.g.,* TR. 502-04. She also

---

[13] Meralgia paraesthetica is "tingling, formication, itching, and other forms of parasthesia in the outer side of the lower part of the thigh in the area of distribution of the lateral femoral cutaneous nerve . . . ." Stedman's at 1090.

[14] Overuse of certain medication may result in "rebound headaches." After stopping the medication, there is generally a subsequent headache improvement. Nat'l Neuroscience Institute, *Analgesic Rebound Headaches*, at http://www.nni.com.sg/ForDoctorsandHealthcareProfessionals/ClinicalNeuroscienceUpdates/Analgesic+Rebound+Headaches.htm (last visited Sept. 12, 2005).

complained of fatigue and shortness of breath. TR. 494, 496. A chest x-ray taken in May 2002, disclosed underlying chronic obstructive pulmonary disease, which was not active, and other findings consistent with bilateral maxillary sinusitis. TR. 502.

On February 26, 2002, Yong Tsai, M.D., conducted an examination of Clifford. TR. 520-21. Dr. Tsai's impression was that Clifford had a history of lupus (SLE), depression, asthma, migraines, and myofascial pain in the hips and right leg.[15] TR. 521. Dr. Tsai prescribed acupuncture, physical therapy and medication. TR. 521.

In September and November 2002, Clifford visited John A. Ortolani, M.D., on several occasions. TR. 525-31. She complained of migraines, lupus, irritable bowel syndrome, and weakness. TR. 529. Dr. Ortolani diagnosed Clifford with vascular headaches, which Clifford experienced once a month.[16] TR. 526. He adjusted her medication, which by June 2003 helped her headaches to be less severe. TR. 541.

On May 29, 2002, K. Jay Adcook, M.D., determined from an x-ray that Clifford's condition was consistent with bilateral maxillary sinusitis. TR. 502.

Clifford's medical records indicate that on June 3, 2003, she saw Dr. Ortolani, who continued roughly the same treatment as before for her headaches. TR. 541.

---

[15] SLE refers to lupus. The Lupus Site, *at* http://www.uklupus.co.uk (last visited Sept. 12, 2005). Myofascial means affecting the layer of tissue that encases the body's organs beneath the skin. Stedman's at 628, 1168.

[16] A vascular headache means a headache that is caused by or somehow related to blood vessels, characterized by particular symptoms. Stedman's at 1909; National Headache Foundation, *Vascular Headaches*, *at* http://www.headaches.org/consumer/topicsheets/vascular.html (last visited July 27, 2005).

C. *Opinions of Reviewing Physicians.*

On May 15, 2000, a physician whose name is not legible completed a physical RFC assessment of Clifford. TR. 387-94. This physician concluded that Clifford had the residual functional capacity to do the following: (1) occasionally lift twenty pounds; (2) frequently lift ten pounds; (3) stand or walk for six hours in an eight-hour workday; (4) sit for six hours in an eight-hour workday; and (5) push and pull to an unlimited extent. TR. 388. In addition, this physician opined that Clifford would have to avoid concentrated exposure to extreme cold and heat, noise and fumes, odors, dusts, gases, poor ventilation, and the like. TR. 391.

On October 1, 2001, Reuben E. Brigety, M.D., an OB/Gyn specialist, completed a physical RFC assessment of Clifford based on a review of her medical records. TR. 478-85. Dr. Brigety opined that Clifford had the capacity to do the following: (1) occasionally lift twenty pounds; (2) frequently lift ten pounds; (3) stand or walk for six hours in an eight-hour workday; (4) sit for six hours in an eight-hour workday; and (4) push or pull without limitations. TR. 479. In addition, Dr. Brigety indicated that Clifford should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and the like. TR. 482.

On January 24, 2002, Alan G. Tetlow, M.D., an anesthesiologist, completed a physical RFC assessment based on a review of Clifford's records. TR. 508-15. Dr. Tetlow's assessment of Clifford's RFC is identical to that of Dr. Brigety.

On August 2, 2003, a physician whose name is illegible completed a medical source statement regarding Clifford's ability to do work. TR. 561-63. This physician opined that Clifford could lift or carry ten pounds, stand or walk less than two hours in an eight-hour workday, sit less

than six hours in an eight-hour work day, and that she would be limited in pushing or pulling with her upper and lower extremities. TR. 561-62. This physician further opined that Clifford's impairments would cause her to miss work more than three times per month, limit her to never climbing or crawling, and limit her to only occasional balancing, kneeling, and crouching. TR. 562. He or she further opined that Clifford would be limited in reaching in all directions and hearing. TR. 563.

**IV.     STANDARD OF REVIEW.**

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C). The Act provides further that a claimant is not disabled if he or she is capable of performing his previous work. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the

findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

**V.     ANALYSIS.**

On appeal to this Court, Clifford contends that the ALJ erred in his assessment of her RFC as a result, in part, of an improper application of the pain standard. She asserts, as well, that the ALJ did not properly develop the requirements of Clifford's past relevant work. These are the only issues I will address.

A.   *RFC.*

Clifford initially asserts that the ALJ erred by failing to adopt the RFC set forth in the "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." *See* TR. 561-63.  As noted above, it is not clear who prepared this form.  As such, there is no basis from which to assess the foundation upon which the opinion was formed – was the preparer a treating physician or merely someone who Clifford asked to review her medical records?  Under these circumstances, the ALJ did not err by failing to credit this RFC assessment.

Clifford next asserts that the ALJ did not properly assess her complaints of joint pain from lupus, headaches and dizziness, and irritable bowel syndrome in arriving at the RFC assessment. The ALJ did find that Clifford had underlying impairments that could cause the pain and other symptoms about which she complained.  The ALJ was required to assess the extent of the pain and other symptoms based on the record as a whole.

In making this assessment, the ALJ relied upon medical evidence in the record that Clifford's headaches were not as frequent as she claimed at the hearing, and that medication had helped reduce the number of headaches and alleviate the pain from them.  Substantial evidence in the record supports this determination.  Medical records reflect that various surgeries to address ear infections, as well as medication, helped alleviate or control Clifford's headaches.  *See, e.g.,* TR. 412, 464-65, 541.[17]  The medical records reflect that Clifford did not experience dizziness, except as an occasional side effect of medication.  *See* TR. 309, 330, 462-63.

---

[17] Clifford's continuing use of Darvocet, in contravention of the instructions from Dr. Kreger to cease using the medication, could account for Clifford's testimony regarding the number of headaches she experienced.

Similarly, the medical records do not support a finding that irritable bowel syndrome would impair Clifford's ability to work. There are few complaints of bowel control problems, and those that were made appear to be the result of intermittent use of antibiotics. *See, e.g.,* TR. 331, 333, *but see* TR. 474-75.

Clifford also asserts that the joint pain arising from lupus was not adequately considered by the ALJ. However, substantial evidence supports the ALJ's finding that she had no loss of motor strength or other weakness associated with this pain. Dr. Kreger noted a sensory deficit in her right thigh and feet, but there is no indication that this deficit significantly impaired Clifford's ability to stand and walk. In this regard, the ALJ's references to Clifford's activities of daily living also support the decision. She told Dr. Graham in 2000 that she was able to care for her boyfriend's grandson, swim with him, and also do household chores and some yard work. At the ALJ's hearing, she acknowledged that she still did household chores and was able to go to the Moose Club and drive a car. These activities of daily living, coupled with the medical evidence, provide substantial evidence to support the ALJ's conclusion that Clifford could sit, stand or walk six hours in an eight-hour work day.

Finally, Clifford contends that the ALJ erred by failing to articulate a "function-by-function assessment" of Clifford's ability to do work-related activities as required by Social Security Ruling 96-8p. Clifford contends that the ALJ's decision was deficient because it did not specifically address her ability to perform sustained work activities. However, the ALJ did find that Clifford could sit, stand or walk for up to six hours in an eight-hour day. This is consistent with the ability to perform sustained work activities, which SSR 96-8p describes as "8 hours a day, for 5 days a

week, or an equivalent work schedule." Under the facts of this case, the ALJ's decision is sufficient to establish that he considered Clifford's ability to perform sustained work activities when determining her RFC.

Accordingly, substantial evidence supports the ALJ's determination of the extent to which Clifford's impairments result in functional limitations, and the RFC assessment reached by the ALJ.

      B.    *Past Relevant Work.*

Clifford contends that the ALJ erred in finding that she could return to her past relevant work because there are varying statements in the record about the requirements of her past work. I note that all of the conflicting statements were made by Clifford, either in written reports or in her testimony. Because Clifford had the burden of proving that she could not return to her past relevant work, it was her obligation to establish the demands of her prior work. *See Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). Having created a record of inconsistent statements about the requirements of her past relevant work, she cannot fairly argue that the ALJ erred by crediting the testimony she provided at the hearing rather than in her earlier written reports.

Clifford is correct that she testified that she had to lift heavy items while working at K-Mart. If these items exceeded ten pounds, returning to that job would be precluded by her RFC. Even if the ALJ erred with respect to the work at K-Mart, however, he also found that Clifford could return to her work as a teacher's assistant.

Clifford argues that the ALJ erred by failing to recognize that the teacher's aide job required her to be on her feet most of the day.   Being on one's feet most of the day is not inconsistent with an RFC that includes walking and standing up to six hours in an eight-hour day.

For all of these reasons, I conclude that the ALJ did not err in finding that Clifford could return to her past relevant work as a teacher's assistant.

### VI.   CONCLUSION.

For the reasons stated above, the decision of the SSA is **AFFIRMED.**  It is further **ORDERED** that the Clerk of Court shall issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 13, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties